Filed 12/11/24  V.A. v. Superior Court CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| V.A.,<br><br>        Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF SONOMA COUNTY,<br><br>        Respondent;<br><br>SONOMA COUNTY HUMAN SERVICES DEPARTMENT,<br><br>        Real Party in Interest. | A171534<br><br>(Sonoma County Super. Ct. No. 24JD00072) |

V.A. (mother) petitions for extraordinary writ relief from a juvenile court order setting a permanency planning hearing.  (Welf. & Inst. Code, § 366.26, undesignated statutory references are to this code; Cal. Rules of Court, rule 8.452.)  She seeks a stay of the hearing and contends the court erred when it granted the request of the Sonoma County Human Services Department (Department) to bypass reunification services due to her inability to utilize services because of her mental disability.  (§ 361.5, subd. (b)(2) (§ 361.5(b)(2)).)  We deny mother's writ petition and request for a stay.

1

## BACKGROUND

L.T. was born in April 2024. (All dates refer to 2024.) The same day, hospital staff expressed concern that mother was incapable of caring for her baby. Among other things, staff reported she was "exhibiting severe mental health symptoms," including "disassociative thoughts, seeing people that aren't present, declaring herself to be different people, tapping the baby on the head to wake him up to talk to her, [and] stating the baby is talking to her." She told a social worker she was "dead and reborn" and that she was the social worker's "mother and grandmother." She also told staff she had not been taking prescribed psychotropic medication. Staff transferred the baby to the Neonatal Intensive Care Unit (NICU) and placed mother on a psychiatric hold; days later, she was admitted for inpatient psychiatric care.

Mother's medical records show she received psychiatric care and was placed on a psychiatric hold in February. Her records also indicate a history of "intellectual impairment, neurocognitive disorder, delusional disorder, chronic post-traumatic stress disorder, and psychosocial stressors." After an evaluation in March, she was assessed as suffering from psychosis, prescribed antipsychotic medication, and she expressed a willingness to take the medicine.

In the NICU, L.T. experienced low body temperature, was not eating, appeared lethargic, required antibiotics, and showed indications of an irregular placement of his stomach. The Department obtained a protective custody warrant to detain the child upon his discharge from the hospital. As mother could not identify any family members — including the baby's father — the Department placed the child with mother's friend on an emergency basis.

On May 1, the Department filed a section 300 petition — alleging failure to protect/neglect and no provision for support (§ 300, subds. (b)(1), (g)) — and a detention report. In sum, it argued mother's severe and unresolved mental health issues left her unable to address the baby's immediate needs, resulting in serious harm or imminent danger of serious harm to the child. The next day, a detention hearing was held, the juvenile court found a prima facie case had been established, and a jurisdictional hearing was set for May 23. Although mother did not attend the detention hearing because she was still hospitalized, the court identified counsel to specially appear on her behalf.

Despite having been discharged from the hospital, knowing about the May 23 jurisdictional hearing, and the Department offering transportation, mother did not appear at the hearing. Further, the specially appearing counsel informed the juvenile court that she refused the appointment of counsel because "she had a privately retained attorney." The court discussed how to secure her attendance at hearings and ensure she was represented, and it considered whether appointment of a guardian ad litem (GAL) might be necessary. It also expressed frustration about the impact of resultant delay on the baby and found mother voluntarily absented herself. It continued the hearing to June 6 to enable her to attend and to receive the Department's jurisdiction report and recommendations.

On June 4, the Department filed its jurisdiction report, recommending the juvenile court declare L.T. a dependent and order mother to submit to a psychological evaluation. Regarding mother's mental health, the social worker reported she was supposed to transition to a residential program upon her discharge from the psychiatric facility but never appeared. She told the social worker her "baby had been kidnapped by someone" and she "knew

3

that the [social worker] was 'the police' and 'trying to put her in jail.' "
Despite reporting she was taking her medication, the social worker found her
statements "incoherent, confusing, and objectively false." The report also
contained summaries of interviews conducted with mother's friends and
family. Her friend — with whom L.T. was placed — reported she had
"always appeared to have 'issues with mental health, or delays that are very
noticeable' " and opined " 'she cannot survive on her own.' " Mother's half-
sister reported that mother " 'always had mental delays.' "

Mother appeared at the June 6 hearing by phone, making several
incoherent remarks. For example, when the juvenile court asked when she
last saw L.T., she responded, "I had got out from the hospital. They put me
in the Sutter hospital, the mental health hospital, and I'm not, like, low from
the head. I was an iPhone girl." Later, after the court tried to explain the
need to appoint counsel to represent her, she responded, "Yeah. They took
my baby because since I was born — I was born premature and I had, like,
meningitis and I had schizophrenia and then they found out I didn't have
that. I got big." She went on, "Yeah. I'm special. Our daughter, special
needs." The court appointed counsel for mother — which mother
acknowledged — and counsel indicated she would evaluate whether
appointment of a GAL was necessary. At counsel's request, the matter was
put over for a settlement conference on June 12, with a continued
jurisdictional hearing on June 13.

Mother failed to appear at the settlement conference or the June 13
jurisdictional hearing. At the hearing, the social worker indicated he had
tried to contact and locate her but was unsuccessful. Her counsel indicated
she had spoken with her client that day but asked for another continuance to
follow up with her about the appointment of a GAL. Despite the juvenile

4

court's concern with the repeated failures to appear and their impact on the baby, it granted a one-week continuance to June 20.

On June 20, mother again failed to appear. Her counsel asked to be relieved, indicating she'd spoken with her client, and mother did not want to work with counsel. In the absence of her appearing, the juvenile court declined to relieve counsel, and it also denied counsel's request for another continuance. The court proceeded with the jurisdictional hearing as a default matter, finding mother again voluntarily absented herself. The court found the section 300 allegations true, ordered mother to submit to psychological evaluation, and set a dispositional hearing for July 17. The dispositional hearing was ultimately continued to August 21 to allow more time to schedule a psychological evaluation.

The Department filed its disposition report on August 20. It asked the court to declare L.T. a dependent, bypass reunification services under section 361.5(b)(2), and set a permanency planning hearing. Regarding the ordered evaluation, the social worker said he'd made an appointment for mother, told her about it, explained why her participation was important, and offered transportation, but mother said she did not want to go. Despite follow-up calls and text messages, she did not attend the appointment. The social worker scheduled a second appointment, and mother again refused to participate. An offer of transportation and communication attempts were unsuccessful, and she did not attend the appointment. Her refusal to comply left the social worker "unable to comment on the extent of [her] current mental health needs." Even so, given the record, the Department asked the court to bypass reunification services because mother was incapable — as a result of her mental disability — from utilizing the services. (§ 361.5(b)(2).)

5

Mother failed to appear on August 21. After discussions with counsel, the juvenile court continued the matter to September 4 to allow her counsel to attempt to persuade her to attend the hearing. Mother attended the September 4 hearing via Zoom. The court attempted to ask her if she was agreeable to the appointment of a GAL. She initially denied having any "mental issues" but agreed when her counsel said her "brain works differently than other people." Ultimately, she agreed to the appointment of a GAL, and the court appointed one; the GAL requested a continuance to speak with her and review the dispositional report. Counsel asked the court to advise mother that it had ordered her to submit to a psychological evaluation and the consequences of not doing so. The court declined to do so, instead indicating the newly appointed GAL could explain that to her. The hearing was continued to September 19.

Mother did not appear on September 19; the hearing was continued to October 3. She again did not appear on October 3 and, after off-the-record discussion with the parties, the juvenile court continued the matter to October 10 over "[its] own objection." She did not appear on October 10, and her counsel and GAL confirmed neither had any contact with her. The social worker described his repeated, but unsuccessful, efforts to locate and contact her. At that point, having reviewed counsel's briefs and arguments, the court adopted the Department's recommendations. Of particular relevance, the court bypassed reunification services pursuant to section 361.5(b)(2), finding mother — even with the provision of services — to be unlikely to be capable of adequately caring for the child within the statutory time limits due to her mental disability. Mother, via her GAL, filed a timely notice of intent to file a writ petition.

6

# DISCUSSION

Mother contends the juvenile court erred by bypassing reunification services pursuant to section 361.5(b)(2). Although this is a sad case, and we do not question mother's love for her child, we find no error. As did *In re C.C.* (2003) 111 Cal.App.4th 76 (*C.C.*), we conclude the court — under the disentitlement doctrine — had "the authority to deny services to a parent who refuses to comply with a valid court order for a psychological evaluation." (*Id.* at p. 80.)

"There is a presumption in dependency cases that parents will receive reunification services. Section 361.5, subdivision (a) directs the juvenile court to order services *whenever* a child is removed from the custody of his or her parent *unless* the case is within the enumerated exceptions in section 361.5, subdivision (b)." (*Cheryl P. v. Superior Court* (2006) 139 Cal.App.4th 87, 95, citations omitted.) We review an order denying services under section 361.5, subdivision (b) for substantial evidence. (*Cheryl P.*, at p. 96.) And we review a court's application of the disentitlement doctrine for abuse of discretion. (*In re Marriage of Cohen* (2023) 89 Cal.App.5th 574, 583.)

Section 361.5, subdivision (b), provides: "Reunification services need not be provided to a parent or guardian described in this subdivision when the court finds, by clear and convincing evidence, any of the following: [¶] . . . [¶] (2) That the parent or guardian is suffering from a mental disability that is described in Chapter 2 (commencing with Section 7820) of Part 4 of Division 12 of the Family Code and that renders the parent or guardian incapable of utilizing those services." Section 361.5, subdivision (c), states, "When it is alleged, pursuant to [section 361.5(b)(2)], that the parent is incapable of utilizing services due to mental disability, the court shall order reunification services unless competent evidence from mental health

7

professionals establishes that, even with the provision of services, the parent is unlikely to be capable of adequately caring for the child within the time limits specified in subdivision (a)."

"Family Code section 7827 is part of the chapter of the Family Code referred to in [section 361.5(b)(2)]." (*C.C.*, *supra*, 111 Cal.App.4th at p. 83.) "Family Code section 7827, subdivision (c) requires that a finding of mental disability be supported by 'the evidence of any two experts,' each of whom must be a psychiatrist or psychologist meeting educational and experience requirements. [Section 361.5(b)(2)] does not expressly state that it incorporates the requirement of two expert opinions. However, courts have found that it does." (*Ibid.*)

Given this procedural backdrop, mother's repeated refusal to comply with the juvenile court's order to submit to a psychological evaluation placed the court in "an untenable position." (*C.C.*, *supra*, 111 Cal.App.4th at p. 84.) Under section 361.5(b)(2), the court could not deny reunification services without finding clear and convincing evidence that she was incapable of utilizing services due to her mental disability. And under Family Code section 7827, subdivision (c), the court could not find she was suffering from a mental disability without evaluations from two mental health experts.

Presented with similar facts, *C.C.* concluded the disentitlement doctrine permitted a juvenile court to deny reunification services to a parent who refused to submit to a court-ordered psychological evaluation. (*C.C.*, *supra*, 111 Cal.App.4th at p. 80.) " 'A party to an action cannot, with right or reason, ask the aid and assistance of a court in hearing [her] demands while [she] stands in an attitude of contempt to legal orders and processes of the courts of this state.' " (*Id.* at p. 84.) *C.C.* noted the doctrine has been applied

8

in dependency proceedings and concluded it also applies to a parent who refuses to participate in an evaluation. (*Id.* at pp. 84–85.)

"Mother's conduct makes it impossible for the court to perform its obligation to determine, pursuant to section 361.5(b)(2), whether her mental disability renders her incapable of utilizing reunification services. Mother's conduct also interferes with the legal rights of Minor. If Mother is, in fact, incapable of utilizing services, Minor is entitled to have [his] case proceed to the permanency planning stage without the delay of 12 months or more that must be afforded if reunification services are provided to Mother. 'While this may not seem a long period of time to an adult, it can be a lifetime to a young child.' Mother . . . is 'entirely responsible for paralyzing the court's ability to implement the procedures intended to benefit the interests of the dependent minor.' " (*C.C.*, *supra*, 111 Cal.App.4th at p. 85, citations omitted.)

We concur. We also agree that the "Legislature could not have intended this result when it enacted section 361.5(b)(2). The requirement of two expert evaluations incorporated into that provision implicitly assumes a cooperative parent who will submit to the evaluations. Where, as here, the parent is not cooperative, a court has the inherent power under the disentitlement doctrine to bar that parent from seeking further assistance from the court, including the provision of reunification services." (*Id.* at p. 85.)

The same holds true here. Mother attended only two of the more than ten hearings or settlement conferences, resulting in significant delay for L.T. With mother's knowledge and agreement, the juvenile court appointed counsel for her and, ultimately, a GAL. After taking jurisdiction over L.T., it also ordered mother to submit to psychological evaluation. Moreover, the record shows she was aware of the multiple appointments made for her, told

9

why it was important for her to participate, and offered transportation. Yet she repeatedly refused to comply. Her noncompliance prevented the court from obtaining expert opinions concerning her current mental disability; even so, the record is otherwise replete with evidence relevant to her disability. On this record, we conclude the court did not abuse its discretion by denying reunification services given mother's repeated refusal to submit to court-ordered psychological evaluation. (*C.C.*, *supra*, 111 Cal.App.4th at p. 80.)

Urging us to reach a different conclusion, mother relies on *In re E.E.* (2020) 49 Cal.App.5th 195. That case is inapposite for various reasons. First, the Court of Appeal was not reviewing a juvenile court's application of the disentitlement doctrine. Instead, it declined the agency's request that it apply the *appellate* disentitlement doctrine to dismiss the mother's appeal. (*Id.* at p. 206.) Second, the primary concern in *E.E.* was that all the noncompliant "conduct [the agency] cites as grounds for the disentitlement doctrine occurred before the court took jurisdiction over the children." (*Id.* at p. 208.) At that point in the proceedings, "the court may not order a parent to cooperate with the social services agency, engage in services, or submit to alcohol or drug testing." (*Ibid.*) Here, by contrast, the juvenile court did not order mother to submit to a psychological evaluation until *after* it had taken jurisdiction. Finally, *E.E.* does not cast doubt on a court's discretion to apply the disentitlement doctrine when a parent's refusal to comply with valid court orders makes it "impossible for the court to safeguard the children's best interests." (*Id.* at p. 208.) In short, nothing in *E.E.* persuades us that the court abused its discretion here.

In closing, we acknowledge that, in "dependency cases, the interest at stake for a parent is 'enormous.' " (*In re E.E.*, *supra*, 49 Cal.App.5th at p. 207.) We also do not question mother's love for her child or the significant

10

mental health challenges she appears to be facing.  But we cannot fault the juvenile court for the many efforts it made to secure mother's attendance at and participation in the process.  Nor can we find an abuse of discretion in its decision to bypass reunification services given mother's repeated refusal to comply with a court order to submit to psychological evaluation.  (*C.C.*, *supra*, 111 Cal.App.4th at p. 80.)

## DISPOSITION

Mother's writ petition is denied on the merits. The request for a stay is also denied.  Because the section 366.26 hearing is set for January 23, 2025, our decision is final as to this court immediately.  (Cal. Rules of Court, rules 8.452(i), 8.490(b)(2)(A).)

11

_____
RODRÍGUEZ, J.

WE CONCUR:


_____
TUCHER, P. J.


_____
PETROU, J.


A171534; *V.A. v. Superior Court*